[Cite as *Southwestern Obstetrics & Gynecology, Inc. v. Mehta, M.D.*, 2014-Ohio-2904.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Southwestern Obstetrics & Gynecology, Inc., | : | |
| | : | |
| Plaintiff-Appellee/ Cross-Appellant, | : | No. 13AP-624 |
| | | (C.P.C. No. 07CV-4650) |
| v. | : | |
| | : | (REGULAR CALENDAR) |
| Shraddha Mehta, M.D., | | |
| | : | |
| Defendant-Appellant/ Cross-Appellee. | : | |

---

## D E C I S I O N

### Rendered on June 30, 2014

---

*Dinsmore & Shohl, LLP*, *Eric J. Plinke*, and *Gregory P. Mathews*, for appellee/cross-appellant.

*Wolinetz Law Offices,* and *Barry H. Wolinetz*, for appellant/cross-appellee.

---

APPEAL from the Franklin County Court of Common Pleas

O'GRADY, J.

{¶ 1} Defendant-appellant/cross-appellee, Shraddha Mehta, M.D., appeals from a judgment of the Franklin County Court of Common Pleas. Plaintiff-appellee/cross-appellant, Southwestern Obstetrics & Gynecology, Inc. ("Southwestern"), filed a cross-appeal. Because we find the trial court erred, we affirm in part and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Dr. Mehta and Southwestern entered into an Employment Agreement on August 6, 2003. The Employment Agreement provided that Dr. Mehta would be employed by Southwestern and would provide professional obstetric and gynecological

services to Southwestern. The agreement was for a three-year term, which expired on June 30, 2006. Dr. Mehta also entered into an Income Advance Agreement ("Advance Agreement") with Mount Carmel Health System ("Mt. Carmel"), which provided that Dr. Mehta agreed to provide services in exchange for professional advance payments. The payments were required to be repaid unless Dr. Mehta continued to practice in a designated area for a specified period of time and met other conditions. Dr. Mehta met the conditions and, beginning October 1, 2004, the total amount of the income advance payments that Mt. Carmel paid ($93,177.81, plus interest) was forgiven over 36 months. The beginning and end dates of the two agreements did not correspond with each other. Dr. Mehta, Mt. Carmel, and Southwestern entered into an Assignment and Consent Agreement ("Assignment Agreement"), in which Dr. Mehta assigned her professional income advance payments to Southwestern.

{¶ 3} Dr. Mehta began her employment with Southwestern on October 1, 2003. The Employment Agreement provided that during her first year of employment Southwestern paid her a fixed salary. Beginning October 1, 2004, Dr. Mehta's compensation was based on a productivity formula, accounting for Dr. Mehta's net earnings and expenses. The income advance payments assigned to Southwestern were credited to Dr. Mehta as part of her compensation when the payments were forgiven. Dr. Mehta decided not to continue her employment at Southwestern and her last day of employment at Southwestern was June 30, 2006, the date her Employment Agreement expired.

{¶ 4} Dr. Diana M. Zitter, the president of Southwestern, testified that, using the agreements and productivity reports, Southwestern determined that Dr. Mehta owed Southwestern $83,311.58 when she left the practice. Southwestern sought to recover the money, pursuant to the Employment Agreement, providing: "Furthermore, if the Corporation has paid to the Employee an amount in excess of her 'productivity', the Corporation may demand that the Employee repay the entire excess in full immediately upon termination."

{¶ 5} Southwestern filed this action asserting claims for breach of contract, unjust enrichment and promissory estoppel. Dr. Mehta filed an answer and counterclaim, asserting Southwestern inappropriately allocated expenses, income advances and loan

forgiveness and she is owed an amount in excess of $25,000. She seeks compensatory damages, interest and attorney fees.

{¶ 6}  The matter was tried before a magistrate, who issued a decision finding that Southwestern was entitled to judgment on its breach of contract claim in the amount of $83,311.58. Dr. Mehta was entitled to judgment on her counterclaim for breach of contract in the amount of $66,625.00. Thus, the magistrate's decision was a net recovery to Southwestern of $17,061.58. Both parties filed objections and the trial court overruled the objections and adopted the magistrate's decision. Dr. Mehta filed an appeal and Southwestern filed a cross-appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 7}  On appeal, Dr. Mehta assigns the following three errors for our review:

ASSIGNMENT OF ERROR I:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DETERMINED THAT DR. MEHTA IS NOT OWED AN ADJUSTMENT FOR THE YEAR 2004.

ASSIGNMENT OF ERROR [II]:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DETERMINED THAT DR. MEHTA IS NOT OWED AN ADJUSTMENT FOR THE YEAR 2006.

ASSIGNMENT OF ERROR [III]:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DETERMINED THAT DR. MEHTA IS NOT ENTITLED TO A CREDIT FOR FUTURE DEBT FORGIVENESS.

{¶ 8}  Southwestern assigns the following error for our review in its cross-appeal:

The trial court erred in finding in Defendant's favor on her breach-of-contract claim because Plaintiff properly allocated malpractice expenses under the terms of the employment agreement.

## III. DISCUSSION

{¶ 9}  Generally, an appellate court reviews a trial court's adoption, denial or modification of a magistrate's decision for an abuse of discretion. *Brunetto v. Curtis*, 10th

Dist. No. 10AP-799, 2011-Ohio-1610, ¶ 10. "Where an appeal from the trial court's action on a magistrate's decision, however, presents only a question of law, such as a question of contract interpretation, we review that question de novo." *Id.*, citing *Shah v. Smith*, 181 Ohio App.3d 264, 2009-Ohio-743, ¶ 7 (1st Dist.).

**A. CROSS-ASSIGNMENT OF ERROR**

{¶ 10} For ease of discussion, we will review Southwestern's cross-assignment of error first. Southwestern contends the trial court erred in finding in Dr. Mehta's favor on her breach of contract claim because Southwestern claims it properly allocated malpractice expenses under the terms of the Employment Agreement. The magistrate determined that Southwestern had miscalculated Dr. Mehta's malpractice premiums and overcharged her $66,625 for the three years ($8,069 for October 1 through December 31, 2004; $45,810 for 2005 and $12,746 for January 1 through June 30, 2006).

{¶ 11} Southwestern argues that although physician malpractice premiums are specifically included as a direct expense under the Employment Agreement, it is Southwestern's policy that the physicians evenly share this expense. Dr. Mehta argues that the plain language of the agreement provides that physician malpractice premiums are "direct expenses" that are "directly attributable to the Employee" and are to be "borne solely by the Employee." Thus, Dr. Mehta should be charged the actual amount of malpractice premiums attributable to her personally and not divide the entire cost among all the physicians.

{¶ 12} The construction of a written contract is a matter of law. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus, superseded by statute on other grounds. Common words in a contract must be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly intended, based on the face or overall contents of the contract. *Id.* at paragraph two of the syllabus.

{¶ 13} The purpose of contract interpretation is to give effect to the intent of the parties and that intent is gleaned through the contract language. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11; *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 247 (1974). *See also Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987) (parties' intent is presumed to reside in the contract language). When a contract dispute

arises, the court first looks to the contract language to determine if an ambiguity exists. "[I]f the contract terms are clear and precise, the contract is not ambiguous and the trial court is not permitted to refer to any evidence outside of the contract itself, including the purported intentions of the parties." *Ryan v. Ryan*, 9th Dist. No. 19347 (Oct. 27, 1999).

{¶ 14} The Employment Agreement between Dr. Mehta and Southwestern set forth that Dr. Mehta's income is based on a productivity formula after her first year, beginning October 1, 2004, as follows:

> [T]he Employee shall be entitled to annual compensation based upon her "productivity" as defined herein, and as modified from time to time by agreement between the Employee and the Board of Directors. For the purposes of this Agreement, "Net Earnings" shall be determined by deducting from the gross income of the Corporation attributable to services rendered by the Employee, the Employee's share of Office Expenses and any and all Direct Expenses. "Net Earnings" credited to Employee shall also include any "Professional Income Advances," as such term is defined in the [Advance Agreement] entered into between Employee and Mount Carmel Health System ("Mt. Carmel"), which have been assigned to Corporation by Employee, and which Professional Income Advances are not required to be repaid by the Corporation to Mt. Carmel because they have been forgiven pursuant to Section 3(d) of the aforementioned [Advance Agreement].

{¶ 15} "Office Expenses" and "Direct Expenses" are then separately defined, as follows:

> Office Expenses are overhead and operating expenses attributable to all items, except Direct Expenses, attributable to the provision of professional services, such as rent, utilities, staff and ancillary personnel salaries and payroll taxes, paper products, etc. within the Corporation. Office Expenses shall be shared equally and proportionately by physicians participating in the productivity arrangement.
>
> Seventy percent (70%) of the total Office Expenses shall be designated as "Fixed Expenses." For purposes of allocating such expenses, Employee shall be treated like the full-time physician employees of the Corporation and shall share sucy expenses equally with the full-time physician employees participating in this productivity arrangement.

Thirty percent (30%) of the total Office Expenses shall be designated as "Variable Expenses." Variable expenses shall be shared proportionately according to the physician employee's Production Ratio. "Production Ratio" is equal to the receipts for the Corporation attributable to the professional services of Employee, divided by the total receipts of the Corporation.

Direct expenses are those expenses directly attributable to the Employee ("Direct Expenses"), such as dues, subscriptions, physician malpractice and health insurance premiums, etc. and are borne solely by the Employee.

{¶ 16} The Employment Agreement provides, at Section 4, that the employee's annual compensation based upon her productivity "shall be equal to the sum of (1) the actual fees collected by the Corporation which are directly related to professional services rendered by the Employee, and (2) the monthly loan repayments which the Corporation is obligated to repay to Mt. Carmel and which have been forgiven pursuant to Section 3(d) of the [Advance Agreement] * * *, reduced by the amount of annual salary and/or draws paid to the Employee pursuant to this paragraph 4, reduced by Employee's share of Office Expenses, described herein, and further reduced by the amount of Employee's Direct Expenses."

{¶ 17} Dr. Zitter testified regarding Southwestern's computations. She testified that the physicians in the group attended monthly meetings to look at the production figures. Each doctor was responsible for one-fifth of the rotating obstetrician call duties. Dr. Zitter explained that malpractice expenses were applied under direct physician expenses and, thus, were the same for all the physicians. Since all the physicians evenly divided the obstetrician call duty, which is the bulk of the malpractice, the expense was also equally divided. This expense had been computed in this manner since at least 1984, when Dr. Zitter joined Southwestern.

{¶ 18} Dr. Mehta's expert, Brian A. Russell, relied on the actual malpractice premiums charged to Dr. Mehta, rather than Southwestern's reports, which evenly divided the malpractice premiums. Russell testified regarding his computations. He accounted for fiscal years and calendar years and the periods associated with the premiums to remove any overlap and determine Dr. Mehta's individual malpractice premiums. He also subtracted the nine months in 2004 when Dr. Mehta was a salaried

employee, not subject to the productivity formula. Thus, Russell determined that Southwestern overcharged Dr. Mehta $8,069 for 2004 (October 1 through December 31), $45,810 for 2005 and $12,746 for 2006 (January 1 through June 30) for a total of $66,625.

{¶ 19} The magistrate found the language of the Employment Agreement was clear in that the physician malpractice premiums are direct expenses directly attributable to the physicians. The expense should not be evenly divided among the five physicians, but each physician charged the actual premium. Thus, the magistrate determined that Dr. Mehta was owed a credit of $66,625 for the overcharge of malpractice premium expenses.

{¶ 20} We find, as the trial court did, that the Employment Agreement language is clear and physician malpractice premiums are listed as an example of a "direct expense" and should be borne solely by each employee. These expenses should not be evenly divided among the physicians like office expenses.

{¶ 21} This finding renders Southwestern's calculations and exhibits incorrect because the malpractice premiums are equally divided among the physicians, rather than each physician charged an individual amount. However, neither party determined Dr. Mehta's actual profit/loss for October 1 through December 31, 2004. Both parties used the entire 2004 year and then Russell determined the amount Dr. Mehta was overcharged for the year by redetermining her income, but based it on the entire year. For nine months of 2004, Dr. Mehta's compensation was not based on the productivity formula, but, rather, she was paid a salary. The numbers both parties used to calculate her income and expenses were for the entire year.

{¶ 22} Not only are both parties' calculations based on an entire year but some of the exhibits do not correspond to the facts. For example, the stipulated facts state the Mt. Carmel loan forgiveness began October 1, 2004; yet, Exhibit G shows the amount forgiven by year and states that forgiveness began in November 2004. This calls into question whether Exhibit G demonstrates that appropriate amount of forgiveness per year, which is important in using the productivity formula to determine Dr. Mehta's compensation.

{¶ 23} Another example of an exhibit creating doubt concerning the calculations is Schedule 2, the document demonstrating the calculation of Dr. Mehta's malpractice premiums per year. The document provides the net premium for August 1 through

December 31, 2004 is $10,364.00, which corresponds to $2,072.80 per month, multiplied by three months = $6,218.40 for the last quarter of 2004. However, the total provided on Schedule 2 for the 2004 year is $16,348.00, which would be $4,087.00 per quarter.

{¶ 24} A third example involves the exhibits regarding the Mt. Carmel loan forgiveness, again one document provides $30,026.73 for forgiveness in 2005 and the other $31,140 for 2005. Dr. Zitter could not explain the discrepancy, stating "I'm sorry. I cannot [explain the difference in numbers]." (Tr. 32.) The parties need to provide accurate exhibits in order to determine any monies owed.

{¶ 25} Thus, it is clear that Southwestern improperly allocated malpractice expenses under the terms of the Employment Agreement which resulted in Dr. Mehta being overcharged. Since the exact amount of the overcharge is not decipherable from the trial exhibits, the trial court will need to redetermine the amount. Southwestern's cross-assignment of error is overruled.

### B. APPELLANT'S ASSIGNMENTS OF ERROR

{¶ 26} Dr. Mehta argues in her first assignment of error the trial court erred when it determined that she was not owed an adjustment for year 2004. She contends the magistrate correctly found that she was entitled to $66,625 because of an overallocation of malpractice premiums during her employment; however, the magistrate failed to determine she was entitled to an adjusted 2004 net profit allocation. Russell testified that when Dr. Mehta's compensation is adjusted for the correct malpractice premiums, then her share of the profit, after Mt. Carmel loan forgiveness is accounted for, also changes.

{¶ 27} Southwestern argues that Dr. Mehta is attempting to use a productivity credit for the entire 2004 year, rather than only the last quarter. However, Southwestern does not acknowledge that its calculations and exhibits are also based on the entire year. Southwestern does admit that "[o]nce it is assumed that malpractice expenses were not properly allocated, this figure [Southwestern's original loss calculation, $79,213.50] no longer accurately reflects Dr. Mehta's loss while on salary." (Appellee's Brief, 7.) Southwestern also admits that, if the original malpractice allocation was incorrect, the loss amount would have to be reduced. "Assuming (as the trial court found) that the original malpractice allocation was incorrect, the loss amount would have to be adjusted

as well. The original loss amount of $79,213.50 would have to be reduced by at least $24,208.49, which is the amount Dr. Mehta claims was erroneously attributed to her. This means that Dr. Mehta's adjusted loss while on salary would be no more than $55,005.01." (Appellee's Brief, 7.)

{¶ 28} However, Southwestern does not acknowledge that the numbers on their exhibits are incorrect, and Dr. Mehta based her numbers on the discovery provided by Southwestern.

{¶ 29} Moreover, Dr. Zitter testified that at the end of the year, if the physician has a positive number in the productivity calculation, the physician is paid that amount as a productivity bonus, but, if the salary exceeds their productivity, the physician either has to adjust their salary or pay the money back at the end of the year. The Employment Agreement provides for such reconciliation. "Periodically, the Corporation shall calculate the Employee's 'productivity' for that period. If the Employee has been paid less than her 'productivity' for the period, the Corporation shall make an additional payment to her representing the deficit. If the Corporation has paid to the Employee an amount in excess of her 'productivity', it shall reduce future compensation to her until the excess has been eliminated." Thus, Dr. Mehta's losses and gains were to be reconciled at the end of each year. Southwestern's exhibits do not reflect any reconciliation. Such reconciliation must be taken into account when determining any monies due either party, since, for example, Dr. Mehta paid the corporation $2,418.06 at the end of 2004 as a loss for the year (again this calculation includes the entire year, not the last three months).

{¶ 30} It is clear that once we determined that Southwestern incorrectly accounted for the malpractice premiums, the income/loss of Dr. Mehta must be recalculated. Both parties acknowledge this fact. However, given the state of the exhibits, we are unwilling to perform this recalculation. Southwestern admits their numbers are incorrect and Russell's numbers are based on Southwestern's numbers. Thus, we cannot say that Dr. Mehta is owed a credit for 2004, but the loss amount that Southwestern provided is incorrect. Dr. Mehta's first assignment of error is sustained in part, but not as to the amount of the credit, and overruled in part.

{¶ 31} By her second assignment of error, Dr. Mehta contends the trial court erred when it determined that she is not owed an adjustment for year 2006. Dr. Mehta argues

that she is entitled to a $33,594.89 credit as an adjustment to debt forgiveness in 2006. The argument has two parts: first, Dr. Mehta argues she is entitled to a credit of $15,626.00 as a result of Southwestern's over-allocation of the amount of debt forgiveness for 2006, and secondly, she is entitled to a credit of $17,968.89 because Southwestern improperly charged this amount to her in its final calculation for 2006.

{¶ 32} Initially, we note that, pursuant to Exhibit G, $33,011.76 was the amount forgiven in 2006, not $31,250.06. $31,250.06 is the principal amount loaned and $1,761.70 is the interest. The Advance Agreement provides that "the entire amount of the unreimbursed Professional Income Advance, *together with interest*, shall be forgiven [if the requirements are met]." (Emphasis added.) Thus, $16,505.88 ($33,011.76 divided by 2) should be credited to Dr. Mehta for January 1 through June 30, 2006 as loan forgiveness and part of her compensation.

{¶ 33} However, Southwestern deducted $17,968.89 from her income for 2006. This results from an accounting mistake in 2004. In 2004, Southwestern credited Dr. Mehta with $73,177.81 and $7,785.00 for the Mt. Carmel loan forgiveness. In 2005, Southwestern credited Dr. Mehta with $31,140.00 for the Mt. Carmel loan forgiveness.[1] However, in 2006 Southwestern made an adjustment to the balance sheet of $17,968.89 to correct the $73,177.81 credit in 2004. ($7,785.00 (2004) + $31,140.00 (2005) + $16,505.88 (2006) = $55,430.88. $73,177.81 - $55,430.88 = $17,746.93, close to the amount Southwestern used to adjust the balance sheet.) Thus, given the state of Southwestern's balance sheets, this deduction would be proper (although not the correct amount). However, again we note that Southwestern's exhibits for 2004 and 2006 include the entire year, not the relevant time periods for determining Dr. Mehta's compensation using the productivity formula. Therefore, as previously pointed out, Exhibit D is inaccurate and Exhibit G's accuracy is questionable. When determining Dr. Mehta's income, the Mt. Carmel forgiveness amounts are $7,785.00 (2004) + $33,011.76 (2005) + $16,505.88 (2006) = $57,302.64, assuming Exhibit G is accurate. These are the amounts that Dr. Mehta is entitled to be credited for the forgiveness of the Mt. Carmel

[1] Southwestern used the figure including interest in 2004, but the figure without interest in 2005. The credit in 2005 should be $33,011.76, assuming Exhibit G is accurate. We have already pointed out its accuracy is questionable.

loan while she was employed by Southwestern. Thus, Dr. Mehta's second assignment of error is sustained in part and overruled in part.

{¶ 34} By her third assignment of error, Dr. Mehta contends the trial court erred and abused its discretion when it determined that Dr. Mehta is not entitled to a credit for future debt forgiveness. Dr. Mehta assigned the professional income advance payments from Mt. Carmel to Southwestern. Dr. Mehta argues that Southwestern was obligated to extend further productivity credit to her because Southwestern was not obligated to repay the amounts forgiven by Mt. Carmel after she left Southwestern because she complied with the requirements for the loan to be forgiven. Again, the beginning and end dates of the Employment Agreement and the Advance Agreement do not correspond. Loan amounts were forgiven in a monthly amount for 36 months beginning October 2004, therefore, the Advance Agreement provided for forgiveness through September 2007, but Dr. Mehta's last day of employment was June 30, 2006. Dr. Mehta argues that she is entitled to credit for the $44,016 that was forgiven after she was no longer employed, because Southwestern received the benefit of the forgiveness.[2]

{¶ 35} The magistrate found that the Employment Agreement, Advance Agreement and Assignment Agreement do not provide for Dr. Mehta receiving productivity credit or future compensation after her employment with Southwestern terminated. Further, Dr. Mehta was not entitled to a credit due to unjust enrichment because there was no bad faith or fraud on the part of Southwestern. We agree with the trial court on this issue.

{¶ 36} The Employment Agreement provides that the Mt. Carmel income advances shall be credited, as follows:

> The Employee's annual compensation based upon her "productivity" shall be equal to the sum of (1) the actual fees collected by the Corporation which are directly related to professional services rendered by the Employee, and (2) the monthly loan repayments which the Corporation is obligated to repay to Mt. Carmel and which have been forgiven pursuant to Section 3(d) of the [Advance Agreement] entered into between the Employee and Mt. Carmel, reduced by the amount of annual salary and/or draws paid to the Employee

---

[2] Dr. Mehta's expert, Russell, testified the loan forgiveness after she left Southwestern is $42,946. The magistrate relied on this figure. However, Russell's Exhibit 1, Schedule 4 also includes the interest and that total is $44,016.

pursuant to this paragraph 4, reduced by Employee's share of Office Expenses, described herein, and further reduced by the amount of Employee's Direct Expenses.

{¶ 37} The Advance Agreement provides:

At the end of the Advance Period, the outstanding balance, if any, of all moneys advanced to Physician under the Professional Income Advance which remain unreimbursed together with interest accrued during such period shall be calculated by [Mt. Carmel]. Thereafter, Physician shall repay the total amount of unreimbursed advances and interest to [Mt. Carmel] in cash in thirty-six (36) equal monthly installments commencing on the first day of the first month following the end of the Advance Period and continuing on the first of each month until all sums due are paid in full; provided, however, if: (i) Physician is practicing in Central Ohio, (ii) Physician's practice is open to Medicare and Medicaid patients, and (iii) Physician has not breached any of the other terms and conditions of this Agreement, the monthly payment due shall be forgiven by [Mt. Carmel] (such amount forgiven will constitute additional compensation to Physician). Therefore, if the Physician complies with such requirements for the entire three (3) years, the entire amount of the unreimbursed Professional Income Advance, together with interest, shall be forgiven.

{¶ 38} Pursuant to the Assignment Agreement, Dr. Mehta assigned to Southwestern "any and all 'Professional Income Advances' * * * from the Hospital" and "[a]s long as Physician has not breached the terms of her Employment Agreement, [Southwestern] agrees that it will repay Hospital for all funds advanced by Hospital pursuant to the Recruitment Agreement as required thereunder, and will hold Physician harmless from any and all financial responsibilities which would otherwise be required of Physician."

{¶ 39} None of the contracts provide that Dr. Mehta would continue to receive productivity credit for the loan forgiveness after her employment ended. Dr. Mehta's compensation was determined in part by the monthly loan repayments which Southwestern is obligated to repay to Mt. Carmel and which "have been forgiven pursuant to Section 3(d)" of the Advance Agreement. There is no provision that she receive credit

for the loan forgiveness after her employment ended. As already stated, the beginning and end dates of the Employment Agreement and Advance Agreement do not correspond.

{¶ 40} Russell testified at trial that because Southwestern continued to receive forgiveness of the loan after Dr. Mehta ended her employment, Dr. Mehta should be entitled to a corresponding adjustment. The magistrate found this argument was equitable in nature and without factual support. Unjust enrichment is a doctrine derived from the natural law of equity. *U.S. Health Practices, Inc. v. Byron Blake, M.D., Inc.*, 10th Dist. No. 00AP-1002 (Mar. 22, 2001), citing *Loyer v. Loyer*, 6th Dist. No. H-95-068 (Aug. 16, 1996). An equitable action for unjust enrichment will not lie in the absence of fraud or bad faith when the subject of the claim is governed by an express contract, and since here, there was no evidence of fraud or bad faith, the contract controls. *See Natl./RS, Inc. v. Huff*, 10th Dist. No. 10AP-306, 2010-Ohio-6530, ¶ 28, citing *Kucan v. Gen. Am. Life Ins. Co.*, 10th Dist. No. 01AP-1009, 2002-Ohio-4290, ¶ 39. Here, there was no evidence presented of bad faith or fraud by Southwestern. In fact, the parties should have been aware at the time the contracts were signed that the beginning and end dates of the contracts did not correspond. If the parties had wished to have the contracts terminate contemporaneously, the contracts could have been written to do so. However, the parties did not do so. Dr. Mehta's claim for equitable relief in the form of unjust enrichment is precluded by the express contracts. Dr. Mehta's third assignment of error is overruled.

## IV. CONCLUSION

{¶ 41} For the foregoing reasons, Dr. Mehta's first and second assignments of error are sustained in part and overruled in part, her third assignment of error is overruled, Southwestern's cross-assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed in part, reversed in part, and remanded to redetermine the amount payable to both parties.

*Judgment affirmed in part and reversed in part;*
*cause remanded with instructions.*

BROWN and DORRIAN, JJ., concur.

———————————